1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**
9                    **CENTRAL DISTRICT OF CALIFORNIA**
10
11   CITIGROUP GLOBAL MARKETS          Case No. 2:11-cv-04514-MRP-MAN
     INC.,
12                                      **FINDINGS OF FACT**
                      Plaintiff,
13          v.
14   IMPAC SECURED ASSETS CORP., et
     al.,
15
                      Defendants.
16
17
18
19
20
21
22
23
24
25
26
27
28

1    The Court does not usually make separate findings of fact, but in light of

2  some of the confusing arguments made here it is necessary to do so with more than

3  the usual degree of clarity.  The following facts are presented chronologically.

4  Many of the facts are undisputed.  Where a fact is undisputed, the Court cites to

5  CGMI's Statement of Uncontroverted Facts, ECF No. 50, or to the record.  Where

6  Impac objected solely to limit the proposed fact, the Court has incorporated

7  Impac's limitation and cites to both CGMI's Statement of Uncontroverted Facts

8  and Impac's Proposed Statement of Genuine Issues.  Where Impac disputes a fact

9  that is not subject to reasonable dispute, the Court cites to the Section of the

10  accompanying Memorandum that addresses the fact.  The Court makes the

11  following findings of fact:

12  1.    Impac Secured is a wholly owned subsidiary of Impac Funding.  (UF No. 1;

13         SGI No. 1)

14  2.    Impac Funding is a wholly owned subsidiary of IMH.  (UF No. 1; SGI No.

15         1)

16  3.    The Impac Defendants and their representatives refer to the Impac

17         Defendants collectively as "Impac" or "The Impac Companies."  (UF No. 2)

18  4.    In 2007, IMH, Impac Funding, and Impac Secured were in the mortgage-

19         backed securities business.  (UF No. 3)

20  5.    In 2007, Impac Funding conducted IMH's mortgage-backed securities

21         conduit operations, i.e., the purchase, sale, and securitization of mortgage

22         loans.  (UF No. 4)

23  6.    Impac Secured was organized for the sole purpose of serving as a private

24         secondary-market mortgage conduit for Impac Funding.  (UF No. 5; SGI

25         No. 5)

26  7.    Impac Secured had no employees of its own, and was not intended to have

27         any of its own assets.  (UF No. 6)

28  8.    Impac Secured created the 2007-3 Trust during the first half of 2007.  (UF

1      No. 7; SGI No. 7)

2   9.   At its inception, the 2007-3 Trust comprised approximately $800 million in

3        residential mortgage loans.  (UF No. 8)

4   10.  The 2007-3 Trust was created pursuant to a pooling and servicing agreement

5        among IMH, Impac Secured, Impac Funding, and Deutsche Bank National

6        Trust Company.  (UF No. 9; SGI No. 9)

7   11.  Impac Secured acted as Depositor for the 2007-3 Trust; it received mortgage

8        loans for transfer into the trust pursuant to a Mortgage Loan Purchase

9        Agreement among Impac Secured, Impac Funding, and IMH.  (UF No. 10)

10  12.  Impac Secured acted as Registrant for the 2007-3 Trust at all times relevant

11       to this action.  (UF No. 11)

12  13.  Impac Funding acted as Sponsor and Master Servicer for the 2007-3 Trust

13       and oversaw the servicing of those loans on the trust's behalf.  (UF No. 12)

14  14.  Deutsche Bank served as Trustee for the 2007-3 Trust, performing "those

15       duties specifically required by the pooling and servicing agreement,"

16       including the duty to make distributions to investors.  (UF No. 13)

17  15.  Impac Secured's officers made its decisions and signed SEC filings on its

18       behalf.  (UF No. 14)

19  16.  Impac Secured's officers also worked for IMH, Impac Funding, or both at

20       the times relevant to this lawsuit.  (UF No. 15)

21  17.  Impac Secured directors also worked for IMH, Impac Funding, or both at the

22       times relevant to this lawsuit.  (UF No. 16)

23  18.  Impac Funding had no independent directors.  (UF No. 17)

24  19.  James Malloy testified as a Rule 30(b)(6) witness for Impac Secured and

25       Impac Funding.  (UF No. 18)

26  20.  James Malloy testified that he believed that Gretchen Verdugo worked for

27       IMH in 2007, but he did not know if she worked for either Impac Secured or

28       Impac Funding.  (UF No. 19)

21.   James Malloy was never an officer for Impac Secured and testified that he did not know if he was ever an employee of Impac Secured.  (UF No. 20)

22.   James Malloy testified that he did not know if he was ever an officer of Impac Funding.  (UF No. 21)

23.   James Malloy testified that he "managed the securitization" of the 2007-3 Trust.  (UF No. 22)

24.   James Malloy testified that he worked on the 2007-3 Trust for IMH and that, in his capacity as an employee for IHM, he was the "primary interface between the underwriters, the lawyers, the accountants, rating agencies, and . . . key transaction participants" for the 2007-3 Trust.  (UF No. 22; SGI No. 22)

25.   James Malloy testified that he "reviewed drafts of operative documents that ultimately would get filed on EDGAR as part of the '34 Act process."  (UF No. 22; SGI No. 22)

26.   Ron Morrison, Impac's General Counsel, testified as a Rule 30(b)(6) witness for IMH.  (UF No. 23)

27.   Ron Morrison participated in the preparation of documents that would be filed on EDGAR for Impac's trusts, but he made no effort to work for one Impac entity in particular when doing so.  (UF No. 24)

28.   Ron Morrison could think of only two situations when he might have reviewed a document for one Impac entity in particular, and reviewing a pooling and servicing agreement for an Impac trust was not one of those situations.  (UF No. 25)

29.   Ron Morrison reported to IMH's CEO at all times relevant to this lawsuit. (UF No. 26)

30.   IMH, Impac Funding, and Impac Secured collectively sued Thacher Proffitt & Wood LLP in Dissolution ("Thacher") and Vintage Filings LLC ("Vintage") as Third-Party Defendants in this case.  (UF No. 27)

31.      IMH, Impac Funding, and Impac Secured have a long-standing relationship with Thacher and Vintage related to preparing and filing documents with the SEC on Impac's behalf.  (UF No. 28)

32.      Thacher served as counsel for IMH, Impac Funding, and Impac Secured in connection with the 2007-3 Trust, including in connection with preparing the PSA for the 2007-3 Trust.  (UF No. 29)

33.      IMH, Impac Secured, and Impac Funding each had the power to direct Thacher to include specific provisions in documents that would be filed on EDGAR for the 2007-3 Trust, including the PSA for the 2007-3 Trust.  (UF No. 32)

34.      Vintage served as the financial printer for the 2007-3 Trust.  (UF No. 33; SGI No. 33)

35.      Vintage prepared filings to be uploaded onto EDGAR for the 2007-3 Trust. (UF No. 33; SGI No. 33)

36.      Impac paid Thacher and Vintage for their work as counsel and financial printer, respectively.  (UF No. 34)

37.      On or about April 30, 2007, Gretchen Verdugo and Nancy Pollard signed notarized signature pages for the PSA for the 2007-3 Trust on Impac's behalf (the "PSA Signature Pages").  (UF No. 35)

38.      Gretchen Verdugo was Executive Vice President and Chief Financial Officer of both Impac Secured and IMH when she signed the PSA Signature Pages, and she signed the PSA Signature Pages on behalf of those entities.  (UF No. 36)

39.      Nancy Pollard was Executive Vice President of Impac Funding when she signed the PSA Signature Pages, and she signed the PSA Signature Pages on behalf of Impac Funding.  (UF No. 37)

40.      On or about April 30, 2007, Gretchen Verdugo certified that she had "carefully examined" the PSA for the 2007-3 Trust.  (UF No. 38)

41.  The PSA for the 2007-3 Trust (as it was finalized) did not exist on or before April 30, 2007; Impac had a draft PSA for the trust at that time, but it did not contain the Trigger Provision.  (UF No. 39)

42.  Impac's officers signed the PSA Signature Pages before a correct version of that document existed, and apparently expected Thacher to attach the signature pages to the correct document sometime in the future.  (UF No. 43)

43.  A draft PSA that included the Trigger Provision did not exist until May 22, 2007, when Yvonne Teruya (an Impac employee) directed Thacher to include the Trigger Provision.  (UF No. 40; SGI No. 40)

44.  There was no point in time when Impac gave formal approval for a final PSA to be filed on EDGAR for the 2007-3 Trust.  (UF No. 44; SGI No. 44)

45.  Impac did not review documents filed with the SEC for its trusts once those documents were filed on EDGAR.  (UF No. 46)

46.  On or about May 15, 2007, Gretchen Verdugo hand-signed a Current Report, SEC Form 8-K, for the 2007-3 Trust (the "May 15, 2007 Current Report").  (UF No. 47)

47.  The May 15, 2007 Current Report expressly references the PSA for the 2007-3 Trust as an exhibit to that document.  (UF No. 48)

48.  On May 24, 2007, Impac Secured filed on EDGAR a Current Report, SEC Form 8-K, for the 2007-3 Trust (the "May 24, 2007 Current Report"), which bears Gretchen Verdugo's electronic signature and references the PSA for the 2007-3 Trust as an exhibit to that document.  (UF No 49; SGI No. 49)

49.  On May 24, 2007, Impac Secured filed on EDGAR a document purporting to be the PSA for the 2007-3 Trust, as an exhibit to the May 24, 2007 Current Report (the "May 24, 2007 PSA"), which bears electronic signatures for Gretchen Verdugo and Nancy Pollard, and which does not include the Trigger Provision.  (UF No. 50; SGI No. 50)

50.  Because the May 24, 2007 PSA did not include the Trigger Provision, it did

| | | |
|---|---|---|
| 1 | | not state the correct terms of distribution for the 2007-3 Trust.  (UF No. 51) |
| 2 | 51. | The May 24, 2007 PSA included an error besides the omission of the |
| 3 | | Trigger Provision, which Impac cannot identify.  (UF No. 52) |
| 4 | 52. | On May 25, 2007, Impac Secured filed on EDGAR an amended Current |
| 5 | | Report, SEC Form 8-K/A, for the 2007-3 Trust (the "May 25, 2007 Current |
| 6 | | Report"), which purports to include the PSA for the 2007-3 Trust as an |
| 7 | | exhibit to that document.  (UF No. 53; SGI No. 53) |
| 8 | 53. | On May 25, 2007, Impac Secured filed on EDGAR a document purporting |
| 9 | | to be the PSA for the 2007-3 Trust as an exhibit to the May 25, 2007 Current |
| 10 | | Report (the "Incorrect PSA").  (UF No. 54; SGI No. 54) |
| 11 | 54. | Impac Secured, Impac Funding, and IMH each filed or caused to be filed the |
| 12 | | documents referred to in Facts 48, 49, 52, and 53.  (Memorandum Section |
| 13 | | III.A.2) |
| 14 | 55. | The May 25, 2007 Current Report and the Incorrect PSA both explain that |
| 15 | | they are filed pursuant to the requirements of the Securities Exchange Act of |
| 16 | | 1934.  (UF No. 55) |
| 17 | 56. | The Incorrect PSA bears Gretchen Verdugo's electronic signature for Impac |
| 18 | | Secured and IMH, and bears Ms. Pollard's signature for Impac Funding. |
| 19 | | (UF No. 56) |
| 20 | 57. | Impac believes that there is only one set of hand-written signatures for the |
| 21 | | PSA for the 2007-3 Trust, and that those signatures were made on or about |
| 22 | | April 30, 2007.  (UF No. 57) |
| 23 | 58. | Impac does not know if either Gretchen Verdugo or Nancy Pollard ever read |
| 24 | | a correct and final copy of the PSA for the 2007-3 Trust, though it has good |
| 25 | | reason to believe that Nancy Pollard did not read any of the final documents |
| 26 | | for the 2007-3 Trust.  UF No. 58) |
| 27 | 59. | The Incorrect PSA misstates the waterfall for the 2007-3 Trust because it |
| 28 | | omits the Trigger Provision, which provides that, upon a certain event (the |

1    "Trigger Event"), distributions would be shared *pro rata* among investors in

2    Classes A1-A, A1-B, and A1-C certificates.  (UF No. 59; SGI No. 59)

3    60.    The Trigger Provision reads as follows: "Notwithstanding the foregoing, on

4    any Distribution Date on which the aggregate Certificate Principal Balance

5    of the Subordinate Certificates and the Overcollateralized Amount have been

6    reduced to zero, the Principal Distribution Amount will be paid concurrently

7    to the Class A Certificates on a *pro rata* basis, based on the Certificate

8    Principal Balances thereof, until reduced to zero."  (UF No. 60)

9    61.    The Incorrect PSA should never have been filed on EDGAR because it is

10   missing the Trigger Provision.  (UF No. 62)

11   62.    The May 25, 2007 Current Report bears the electronic signature of Gretchen

12   Verdugo, even though Ron Morrison hand-signed a copy of the May 25,

13   2007 Current Report before the May 25, 2007 Current Report was filed on

14   EDGAR.  (UF No. 63)

15   63.    Ron Morrison had no recollection of reviewing the distribution section of the

16   PSA that was filed as an attachment to the May 25, 2007 Current Report.

17   (UF No. 64; SGI No. 64)

18   64.    EDGAR filings like the PSA for the 2007-3 Trust are available to the public

19   via the Internet.  (UF No. 65)

20   65.    On May 24, 2007 (and at all times thereafter) Impac knew that the Correct

21   PSA included the Trigger Provision.  (UF No. 41).

22   66.    On May 24, 2007 (and at all times thereafter), Impac could have caused a

23   correct version of the PSA for the 2007-3 Trust to be filed on EDGAR.[1]

24

25   [1] Impac disputes this fact on the grounds that it fails to consider the relationship

26   between IMH, Impac Funding, and Impac Secured.  SGI No. 42.  Impac Secured

27   was the registrant and could have caused a correct version of the PSA for the 2007-

28   3 Trust to be filed on EDGAR at any time.  Fact No. 12.  Impac Secured was a

     wholly owned subsidiary of Impac Funding, which in turn was a wholly-owned

(UF No. 42)

67. On January 15, 2010, with respect to a different Impac trust, Deutsche Bank informed Impac of a discrepancy between the PSA filed on EDGAR and the PSA in Deutsche Bank's possession.  (UF No. 66; SGI No. 66)

68. Impac knows that investors rely on EDGAR filings when making investment decisions.  (UF No. 71)

69. On March 12, 2010, Impac's lawyer informed Impac that the PSA on file with EDGAR for the 2007-3 Trust was missing the Trigger Provision.  (UF No. 72)

70. Impac could not say that it took any steps to inform the public that EDGAR had the wrong PSA on file until the end of April 2010, though it knew that securities in the 2007-3 Trust would be traded in the secondary market.  (UF No. 76)

71. Impac could have filed the Correct PSA on EDGAR on March 12, 2010, or on any day thereafter, but did not do so until April 29, 2010.  (UF No. 77)[2]

72. CGMI purchased approximately $6.8 million of Class A1-A securities in the 2007-3 Trust on March 25, 2010, at a price of 90.06 cents on the dollar; the next closest bid was just behind CGMI.  (UF No. 78)

73. CGMI purchased approximately $1.3 million of Class A1-A securities in the 2007-3 Trust on April 6, 2010, at a price of 89.36 cents on the dollar.  (UF No. 79)

---

subsidiary of IMH.  Facts 1; 2.  Either Impac Funding or IMH could have caused its subsidiary to file a correct version of the PSA for the 2007-3 Trust on EDGAR at any time.

[2] Impac objects that "filing the Correct PSA would have been difficult because on that date it was neither clear what the problem with the Incorrect PSA was, nor was it clear to Impac Secured or its counsel what the proper course of action was."  SGI No. 77.  This objection is beside the point; it does not address whether Impac *could* have filed the Correct PSA on March 12, 2010.

1    74.   CGMI still owns all of the Class A1-A securities that it purchased in the
2          2007-3 Trust on March 25, 2010, and April 6, 2010 (the "Certificates").  (UF
3          No. 80)

4    75.   Kevin E. Counihan II ("Counihan") testified that he read the distribution
5          section of the Incorrect PSA before both the March 25, 2010 and April 6,
6          2010 purchases.  (Counihan Decl. ¶ 7)

7    76.   Counihan testified that he relied on the waterfall described in the Incorrect
8          PSA to decide whether, and at what price, to purchase the Certificates.
9          (Counihan Decl. ¶ 7)

10   77.   When CGMI purchased the Certificates, its traders were aware of the
11         prospectus supplement for the 2007-3 Trust (the "ProSupp").  (UF No. 83)

12   78.   Mr. Counihan testified that, notwithstanding the waterfall described in the
13         ProSupp, CGMI's traders relied on the waterfall described in the Incorrect
14         PSA in their purchase of the Certificates.  (UF No. 84; SGI No. 84;
15         Counihan Decl. ¶¶ 10–12)

16   79.   Mr. Counihan testified that, beginning sometime in 2009, it was the practice
17         of CGMI for a trader to review the important provisions of the ProSupp and
18         the PSA for every MBS investment that CGMI made for its own account.
19         (Counihan Depo 71:4–9)

20   80.   Mr. Counihan testified that CGMI did not have a practice of reviewing the
21         ProSupp and the PSA for transactions in which it acted as a riskless
22         principal.  (Counihan Depo 196:1–197:20)

23   81.   CGMI read the distributions section for the 2007-3 Trust stated in the
24         Incorrect PSA before both the March 25, 2010 and April 6, 2010 purchases,
25         and relied on the waterfall described in that section to decide whether, and at
26         what price, to purchase the Certificates.  (UF 81; Memorandum Section
27         III.A.3)

28   82.   The PSA controls the waterfall for the 2007-3 Trust, not the ProSupp.  (UF

No. 85)

83. As trustee, Deutsche Bank followed the PSA for the 2007-3 Trust given to it by Impac for purposes of making distributions.  (UF No. 86)

84. The ProSupp states that the PSA for the 2007-3 Trust is the "governing instrument."  (UF No. 87)

85. Intex, a leading modeler of cash flows for mortgage-backed securities, also modeled cash flows for the 2007-3 Trust based on a PSA with no Trigger Provision when CGMI purchased the Certificates.  (UF No. 88)

86. CGMI acted reasonably in its reliance on the distributions section for the 2007-3 Trust stated in the Incorrect PSA.  (Memorandum Section III.A.5)

87. The Trigger Event occurred for the 2007-3 Trust on or about April 25, 2010. (UF No. 89)

88. On April 29, 2010, Impac Secured filed, on EDGAR, an Amended Current Report, SEC Form 8-K/A, bearing Ron Morrison's electronic signature, in order to replace the Incorrect PSA on EDGAR with the Correct PSA (the "April 29, 2010 Current Report).  (UF No. 90; SGI No. 90)

89. The April 29, 2010 Current Report states that it was filed "to replace the version of the Pooling and Servicing Agreement which was inadvertently filed . . . as an exhibit to the Form 8-K filed on May 25, 2007."  (UF No. 91)

90. On April 29, 2010, Impac Secured filed the Correct PSA on EDGAR for the 2007-3 Trust as an exhibit to the April 29, 2010 Current Report.  (UF No. 93; SGI No. 93)

91. The Correct PSA states that distributions of principal are paid *pro rata* to Class A investors in the 2007-3 Trust upon the Trigger Event, rather than sequentially.  (UF No. 94)

92. Since May 2010, Deutsche Bank has made principal distributions to Class A investors in the 2007-3 Trust *pro rata*, such that millions of dollars in distributions that would have gone to Class A1-A under the terms of the

1    Incorrect PSA have instead gone to Classes A1-B and A1-C.  (UF No. 95)

2  93.   On April 22, 2011, the Impac Defendants and CGMI entered into a tolling

3    agreement for purposes of tolling the time for CGMI to bring the claims

4    raised against Impac in this lawsuit (the "Tolling Agreement").  (UF No. 98)

5  94.   The Tolling Agreement tolled CGMI's time to bring the claims raised

6    against Impac in this lawsuit for 32 days.  (UF No. 99)

7  95.   CGMI filed this lawsuit on May 25, 2011.  (UF No. 100)

8

9    **IT IS SO ORDERED.**

10

11   DATED:  May __2__, 2012     _____

12        Hon. Mariana R. Pfaelzer

13        United States District Judge

14

15

16

17   _____

18

19

20

21

22

23

24

25

26

27

28